J-A10028-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARLON TRAVIS COOPER | : | |
| | : | |
| Appellant | : | No. 654 EDA 2025 |

Appeal from the Judgment of Sentence Entered January 17, 2025
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0001766-2023

BEFORE:   STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                              **FILED JULY 2, 2026**

Marlon Travis Cooper ("Cooper") appeals from the judgment of sentence imposed following his convictions for: murder of the first degree; conspiracy to commit murder of the first degree; firearms not to be carried without a license; conspiracy to carry firearms without a license; and theft by unlawful taking.[1]  We affirm.

We summarize the relevant factual and procedural history of this matter as follows.  On August 7, 2021, at 4:58 a.m., Chester City police officers responded to a 911 call reporting multiple gunshots fired on the 1200 block of Clover Lane, in the neighborhood known as McCaffery Village.  At the scene, police observed eighteen-year-old Samad Montgomery ("the victim") lying dead on the street next to a gold Lexus, with multiple gunshot wounds to his

_____

[*] Former Justice specially assigned to the Superior Court.
[1] **See** 18 Pa.C.S.A. §§ 2502(a), 903, 6106, 3921(a).

torso. Directly across the street from the victim's body, on the walkway between 1208 and 1210 Clover Lane, police found ten fired shell casings on the ground next to a white cell phone. After a lengthy investigation, police arrested Cooper, Kahsir Bennett ("Bennett"), and Hakeem Montes ("Montes") in connection with the murder. The Commonwealth charged Cooper with, *inter alia*, the above-referenced offenses.

The case proceeded to a jury trial in October 2024.[2] The Commonwealth presented numerous witnesses. Police Officer Oribe Youssef ("Officer Youssef") testified that he was one of the first police officers to arrive at the murder scene. He examined the victim's body, observed multiple gunshot wounds, and determined that the victim was deceased. Officer Youssef then set up police caution tape to secure the 1200 block of Clover Lane, including the area across the street where the shell casings and cell phone were located. Minutes later, Cooper and Bennett exited 1219 Clover Lane and attempted to cross under the caution tape. Officer Youssef, who had encountered Cooper and Bennett numerous times during his routine patrols in McCaffrey Village, stopped them immediately. Cooper asked Officer Youssef about the identity and description of the gunshot victim, and inquired whether the victim was deceased. After Officer Youssef refused to provide any information, Bennett stated that the victim might be his cousin and he wanted to assist with the identification. Officer Youssef declined Bennett's assistance and noted that

_____

[2] Cooper and his two co-defendants, Bennett and Montes, were tried together.

- 2 -

Bennett's behavior was strange because most residents in the area were reluctant to cooperate with police. Bennett then raised his voice and requested to speak with a sergeant, insisting that he needed to enter the crime scene. After police again denied them entry, Bennett and Cooper walked away. Approximately five minutes later, Officer Youssef observed Cooper and Bennett speaking with Felecia Lacey ("Lacey"), a resident of Clover Lane, before they re-entered the residence at 1219 Clover Lane. *See* N.T., 10/21/24, at 82-87, 88-89.

Lacey testified that Cooper and Bennett were "two young bulls" she knew from McCaffrey Village who "told [her] basically to walk up the street to see if [she could] see a phone because one of them dropped a phone." N.T., 10/23/24, at 24. She attempted to access the crime scene to look for the phone but a police officer stopped her. Lacey stated that she later met with detectives at the police station, and she identified Cooper and Bennett in photo arrays as the individuals who asked her to look for the cell phone. *Id*. at 27-30. Lieutenant Vincent Ficchi ("Lieutenant Ficchi") confirmed that Lacey asked him if she could enter the crime scene area to search for a cell phone, but he did not allow her to enter. *Id*. at 46.

Edmund Pisani ("Pisani"), who was qualified as an expert in cyber investigations and digital forensics, testified that he conducted a forensic extraction on the cell phone discovered at the murder scene and determined

that it belonged to Bennett.[3]  Pisani retrieved text messages exchanged between Bennett and the victim three days before the murder, in which they discussed money that the victim owed Bennett.  Pisani also examined the cell phone's call log on August 7, 2021, the day of the murder, and observed that Bennett's cell phone called the victim's cell phone six times between 3:57 a.m. and 4:56 a.m., with no further activity after that time.  Pisani then analyzed the cellular location data from Bennett's cell phone and observed that Bennett's phone was in the area of Pine Street, one block away from Clover Lane, from 8:30 p.m. on August 6, 2021, until 1:00 a.m. on August 7, 2021. The cellular location data showed Benett's cell phone then traveled to Ridley Township at 1:00 a.m., and returned to the Pine Street/Clover Lane area at approximately 4:00 a.m.  Pisani testified that after 4:54 a.m., Bennett's phone remained stationary on the 1200 block of Clover Lane.

Allison Miller ("Miller"), who was qualified as an expert in DNA profiling and analysis, testified that she examined the DNA profile obtained from the swab of the cell phone and concluded that it was consistent with a mixture of at least three individuals.  She deemed two of the three contributors to be "trace contributors," meaning that the DNA sample was insufficient for further analysis.  N.T., 10/24/24, at 117-18.  Miller analyzed the DNA profile from the third contributor and determined that it belonged to Bennett.

_____

[3] At trial, Cooper conceded that the phone was owned by Bennett.  Cooper further conceded that Bennett had permitted him to use the phone during the months leading up to the murders.

Detective Sergeant David McDonald ("Detective McDonald"), who was qualified as an expert in latent print development, examination, and identification, testified that he observed one identifiable latent fingerprint on the back of the cell phone recovered from the crime scene. Detective McDonald testified that the fingerprint on the back of the cell phone "stood out with identifiable features, enough for identification," and he determined that it was a print from a right-hand index finger. N.T., 10/22/24, at 24. Based on a side-by-side comparison of Cooper and Bennett's known fingerprints with the latent fingerprint from the cell phone, Detective McDonald determined that the fingerprint belonged to Cooper. *See id*. at 28.

Detective McDonald further observed numerous partial, smeared, and distorted latent fingerprints on the cell phone that he could not identify. He explained that even though it was Bennett's cell phone, it did not surprise him that there were not any identifiable fingerprints belonging to Bennett on the phone, explaining:

> [Cell phones] are handled many, many times in the same manner by the owner of the phone. So we're going to have those overlays[.] However, when you hand your phone to someone else, they're going to touch it differently and it could be in one of these areas that are pristine and clean, and so that's how you'll get a nice, viable identifiable print.

*Id*. at 29.

William Shute ("Shute"), who was qualified as an expert in the field of historical cell site analysis and geolocation analysis, testified that he reviewed call detail records from cell phones belonging to Cooper, Bennett, and the

victim. The records showed which cellular tower each phone used in the early morning hours of August 7, 2021. The records indicated that Bennett and Cooper's cell phones were together and interacting with the same cellular towers between 2:02 a.m. and 4:16 a.m., at which time Cooper's cell phone powered off. Shute stated that Cooper's cell phone's last interaction with a cellular tower at 4:16 a.m. placed him at the crime scene. Bennett and the victim's cell phones remained powered on and continued to use that same cellular tower between 4:38 a.m. and 4:56 a.m., placing them at the crime scene as well. *See* N.T., 10/24/24, at 169-73.

Detective Louis Grandizio ("Detective Grandizio"), who was qualified as an expert in firearms identification and ballistics, testified that he examined the ten fired cartridge casings. He determined that nine of them were .223 caliber casings for an intermediate rifle, while the tenth was a .9mm Luger casing. Detective Grandizio stated that this indicated the use of two firearms since the bullets were not compatible with the same firearms. He studied the markings on the nine .223 caliber casings and determined that the same firearm had fired seven of them.[4] Detective Grandizio also examined six bullet specimens that the medical examiner retrieved from the victim's body and determined that the specimens were consistent with the .223 caliber fired cartridge casings.

---

[4] Detective Grandizio determined that the other two .223 caliber fired cartridge casings did not have enough individual characteristics to match them to a particular firearm; therefore, he labeled their results as inconclusive.

Nasir Garland ("Garland") testified that he now lives in Delaware but grew up in McCaffrey Village. He stated that the victim and Bennett were "like family" to him, and that he "grew up" with Cooper. N.T., 10/22/24, at 63-65. Garland explained that after turning twenty-one years old, he began making illegal "straw purchases" of firearms for friends in McCaffrey Village. *Id*. at 68. On the evening of August 6, 2021, approximately six hours before the murder, a mutual friend, "Michie," placed a video call to Garland via FaceTime. Garland could see Bennett and Cooper with Michie. During the call, Bennett told Garland that he needed to "make a swap," meaning he wanted to exchange a "dirty" firearm — one that had been used in illegal activity — for a "clean" one. *Id*. at 73-74. Garland refused and ended the call. Bennett then sent several text and audio messages to Garland over the next several hours, demanding that Garland facilitate a firearms exchange and threatening him if he refused. The Commonwealth played the audio messages for the jury. Call log records showed that Cooper also attempted to call Garland twice that evening, but Garland did not answer. Garland stated that he did not exchange firearms with Bennett or Cooper.

Detective David Tyler ("Detective Tyler"), the lead homicide investigator on the case, testified that he reviewed the call logs from cell phones belonging to Cooper, Bennett, and the victim. He stated that on August 7, 2021, between midnight and 4:58 a.m., the approximate time of the murder, there were ten phone calls between the victim and Cooper or the victim and Bennett. *See* N.T., 10/23/24, at 139. Detective Tyler noted that the only outgoing calls

from the victim's cell phone during that same period were to Cooper or the victim's grandmother. At 4:53 a.m., the victim attempted to call Cooper twice, but the calls went to voicemail. Detective Tyler observed that Bennett's last call to the victim's phone was at 4:46 a.m., two minutes before the murder, and lasted thirty-four seconds. At 4:58 a.m., police received a 911 call reporting gunshots.

Detective Tyler further testified that he interviewed Bennett after his arrest, and that Bennett claimed he was in Delaware at the time of the murder. Bennett told Detective Tyler that he woke up around 7:00 a.m. on August 7, 2021, and took an Uber to the crime scene, where he observed a body next to a gold Lexus. Detective Tyler testified that he knew this was false because officials removed the victim's body at approximately 6:30 a.m. Bennett further told Detective Tyler that he lost his cell phone the day before the murder during a foot chase with Police Officer Geoffrey Walls ("Officer Walls"). Officer Walls testified that he did not engage in a foot chase with Bennett on August 6, 2021. *See* N.T., 10/23/24, at 86.

Ceonnah Reynolds ("Reynolds") testified that she and Bennett were previously in a romantic relationship. After Reynolds refused to answer any further questions on the stand, the Commonwealth played an audio recording from Reynold's interview with detectives, where she confirmed that Bennett was not with her on the morning of August 7, 2021, but that he asked her to tell authorities that they were together. The Commonwealth also played an audio recording of Bennett's phone call to Reynolds from jail, where he

instructed her, "You're my alibi. Saying where I was that night." N.T., 10/23/24, at 220.

Cooper and his co-defendants, Bennett and Montes, did not testify in their own defense. At the conclusion of trial, the jury convicted Cooper of murder of the first degree, conspiracy to commit first-degree murder, firearms not to be carried without a license, conspiracy to carry firearms without a license, and theft by unlawful taking. On January 17, 2025, the trial court imposed a sentence of life imprisonment without the possibility of parole. Cooper filed a timely post-sentence motion, which the trial court denied. Cooper then filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Cooper raises the following issue for our review:

Was the evidence insufficient to support all of [Cooper's] convictions in light of the fac[t] that the Commonwealth's main piece of evidence — . . . Cooper's partial fingerprint found on a phone near the decedent — did not show he was present when the decedent was murdered since the Commonwealth provided no evidence proving **when** the partial fingerprint was impressed on the phone?

Cooper's Brief at 2 (emphasis in the original).

As a threshold matter, we must determine whether Cooper's claim challenging the sufficiency of evidence on all charges is preserved for our review. This Court has explained that:

It is well-settled that the failure to develop an adequate argument in an appellate brief may result in waiver of the claim under Pa.R.A.P. 2119. Arguments which are not appropriately developed are waived. When issues are not properly raised and

- 9 -

developed in briefs, or when the briefs are wholly inadequate to present specific issues for review, a Court will not consider the merits thereof. Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review that claim is waived.

**Commonwealth v. Taylor**, 277 A.3d 577, 590-91 (Pa. Super. 2022) (quotation marks and citations omitted). Although Cooper purports to challenge the sufficiency of the evidence supporting all of his convictions, he does not present any arguments in his appellate brief regarding his convictions for firearms not to be carried without a license, conspiracy to carry firearms without a license, and theft by unlawful taking. Indeed, nowhere in the discussion section of his brief does Cooper even mention these convictions. **See** Cooper's Brief at 7-14. This deficiency prevents us from conducting a meaningful review of the sufficiency of the evidence supporting these convictions. **See Taylor**, 277 A.3d at 590-91. Accordingly, we will address the sufficiency of evidence only with respect to Cooper's convictions for murder of the first degree and conspiracy to commit murder of the first degree.[5]

A challenge to the sufficiency of the evidence presents a question of law for which our standard of review is *de novo* and our scope of review is plenary.

_____

[5] Going forward, the word "conspiracy" will refer only to conspiracy to commit murder of the first degree.

*See Commonwealth v. Ewida*, 333 A.3d 1269, 1274 (Pa. Super. 2025).

When considering a challenge to the sufficiency of the evidence:

> [W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged in the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013) (internal quotations and citations omitted). Importantly, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part of none of the evidence. *Commonwealth v. Orr*, 38 A.3d 868, 873 (Pa. Super. 2011 ) (*en banc*).

Our Supreme Court has explained that in order to convict a defendant of first-degree murder:

> [T]he Commonwealth must establish a human being was unlawfully killed, the defendant was responsible for the killing, and

- 11 -

the defendant acted with malice and specific intent to kill. The Commonwealth may use wholly circumstantial evidence to discharge its burden of showing the accused intentionally killed the victim, and circumstantial evidence can itself be sufficient to prove any or every element of the crime.

*Commonwealth v. Perez*, 93 A.3d 829, 841 (Pa. 2014) (citations omitted); *see also* 18 Pa.C.S.A. § 2502(a).

In order to find a defendant guilty of criminal conspiracy, "the Commonwealth must demonstrate that the defendant (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent, and (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Chambers*, 188 A.3d 400, 409-10 (2018) (quotation marks and citation omitted); *see also* 18 Pa.C.S.A. § 903.

Importantly, the Commonwealth typically must rely on circumstantial evidence to establish conspiracy:

> Given the nature of a criminal enterprise, the Commonwealth may rely upon circumstantial evidence to prove the existence and scope of the agreement, as it rarely will have direct evidence to support that element of the offense. While the Commonwealth must show more than mere association, it may inferentially establish the conspiracy by the relation, conduct or circumstances of the parties, combined with the overt acts on the part of co-conspirators.

*Commonwealth v. Wellman*, 344 A.3d 13, 19 (Pa. Super. 2025) (quotation marks and citations omitted). Our Court has explained how the totality of circumstantial evidence can establish the existence of a conspiracy:

> Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime;

- 12 -

and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may create a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

*Commonwealth v. Jordan*, 212 A.3d 91, 97 (Pa. Super. 2019) (citation omitted). "The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished." *Commonwealth v. Gross*, 232 A.3d 819, 839 (Pa. Super. 2020) (*en banc*) (citation omitted). "[O]nce the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, the defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." *Commonwealth v. Reed*, 216 A.3d 1114, 1122 (Pa. Super. 2019) (brackets and citation omitted).

In his challenge to the sufficiency of the evidence for his convictions of first-degree murder and conspiracy to commit first-degree murder, Cooper avers that "[t]he crux of the Commonwealth's case against . . . [him] was his partial fingerprint found on the cell phone across the street from the decedent." Cooper's Brief at 8. Cooper insists that this "partial, undated fingerprint was insufficient to permit a rational juror to convict Cooper beyond a reasonable doubt [because his] partial fingerprint was found on an easily moveable object — a cell phone — and his fingerprints were not found anywhere else at the crime scene or on any other evidence." *Id*. at 8, 10.

Cooper acknowledges that the cell phone belonged to Bennett and that he had access to it for many months before the murder was committed. *See id*. at 10. However, Cooper argues that there was no evidence as to the age of the partial fingerprint or when it was impressed on the phone. *See id*. at 10. Cooper asserts that "[he] could have touched Bennett's phone months before the murder occurred." *Id*. at 10-11.[6]

The trial court considered Cooper's challenge to the sufficiency of the evidence for his first-degree murder conviction and determined that it lacked merit. In its well-reasoned opinion, the trial court determined:

> The Commonwealth proved that the victim's death occurred minutes after several attempted and completed phone calls between the victim, [Cooper] and Bennett. The Commonwealth also proved that [Cooper] and Bennett were together in the hours leading up to the shooting. Nasir Garland testified that while [Cooper] and Bennett were together, they contacted Garland looking for a gun in the hours before the murder.

---

[6] As indicated above, Cooper presents a single, narrow issue for our review which concerns only the presence of his fingerprint on the cell phone found at the murder scene and the age of that fingerprint. *See* Cooper's Brief at 2. Cooper did not raise any other issue in his Statement of Questions Involved. *See id*. Nonetheless, in the argument section of his brief, Cooper attempts to raise several additional issues which are unrelated to the fingerprint found on the cell phone. Pursuant to our Rules of Appellate Procedure, this Court may not consider any issue that is not stated in the statement of questions involved or is fairly suggested thereby. *See* Pa.R.A.P. 2116(a) (providing that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"); *see also Commonwealth v. Fremd*, 860 A.2d 515, 524 (Pa. Super. 2004) (finding waiver where the appellant failed to raise an issue in the Statement of Questions Involved portion of his appellate brief). Thus, as Cooper failed to preserve these unrelated issues for our review, we cannot address them.

The Commonwealth proved there were two different kinds of firearm cartridge casings . . . found at the scene across the street from the victim's body proving that two different firearms were used to shoot at the victim. Two bullet specimens found in the victim's body matched the [caliber of the] cartridge casings found at the scene which proved that the casings found at the scene belonged to the bullets that killed the victim.

The geolocation evidence given by Mr. Shute proved the close proximity of the phones belonging to the victim, [Cooper] and Bennett shortly before the shooting. Although the location of [Cooper's] phone was unknown approximately [thirty] minutes before the shooting, the evidence established that [Cooper's] phone was in the area of the shooting, [and was] powered off before the shooting and [then] powered back on after the shooting. . . .

Officer Youssef and Felecia Lacey testified that [Cooper] was with Bennett when they asked . . . Lacey to see if she could retrieve a phone they had dropped inside the crime scene tape. In addition, the phone found at the crime scene was Bennett's phone and had [Cooper's] fingerprint on it. Officer Youssef testified that [Cooper] and Bennett spoke to him at the crime scene after he saw them come out of a house on Clover Lane.

The evidence of geolocation phone records and eyewitness testimony that places [Cooper] and Bennett at the scene of the crime is overwhelming. Despite this overwhelming evidence that he and [Cooper] were together at the time of the shooting, Bennett tried to get . . . Reynolds to lie for him and say he was with her at the time of the murder. Bennett also told police that he had lost his phone in the area of the shooting during an earlier foot chase with Officer Walls. . . . Reynolds and Officer Walls gave testimony that contradicted and disproved what Bennett said to investigators. Bennett's efforts to distance himself from the crime scene show a consciousness of guilt.

* * * *

The geolocation evidence and eyewitness testimony place [Cooper] with Bennett all night before the murder and at the crime scene both before and after the murder. The location and nature of the different shell casings and [Cooper's] fingerprint on the cell phone found at the scene demonstrated that [Cooper] and

- 15 -

Bennett were together at the crime scene. Taken together, the evidence was sufficient for the jury to find that [Cooper] planned to meet and kill the victim after communicating with him by phone in the hours and minutes before the shooting.

Trial Court Opinion, 6/16/25, at 18-20.

The trial court further considered Cooper's challenge to the sufficiency of the evidence supporting his conspiracy to commit first-degree murder conviction and determined that it was also meritless, reasoning:

As to the first element of conspiracy "the defendant intended to commit or aid in the commission of the criminal act," the Commonwealth proved that [Cooper] was present while Bennett attempted to secure a gun, [Cooper] was communicating with the victim until shortly before the murder[,] and [Cooper] was present at the crime scene. In addition, the bullets found in the victim's body matched the shell casings found at the crime scene.

As to the second element of conspiracy, "entered into an agreement with another . . . to engage in the crime," the Commonwealth['s] evidence proved beyond a reasonable doubt that [Cooper] and Bennett were together and looking for a gun shortly before the murder. The geolocation evidence and [Cooper's] fingerprint on Bennett's cell phone placed [Cooper] and Bennett at the crime scene together . . . before . . . the murder.

The third element of conspiracy requires proof [of an overt act]. As described above, the evidence proved [Cooper's] association with Bennett, [Cooper's] knowledge of getting a gun and meeting the victim, and Defendant's presence at the crime scene which, when taken together, is enough to infer that [Cooper] conspired with Bennett to kill the victim.

Trial Court Opinion, 7/16/25, at 21-22.

Viewing the evidence in the light most favorable to the Commonwealth, we conclude that the evidence presented to the jury, and all reasonable inferences drawn therefrom, was sufficient to support Cooper's conviction for

first-degree murder and conspiracy to commit first-degree murder beyond a reasonable doubt. Despite Cooper's assertions otherwise, the evidence presented by the Commonwealth in support of his guilt consisted of far more than his fingerprint on the cell phone. To the contrary, several pieces of evidence adduced at trial demonstrated Cooper's participation in the plan to kill the victim, and his presence at the crime scene both before, during, and after the murder, including: (1) Garland's testimony that Cooper was with Bennett during a FaceTime call approximately six hours before the murder when Bennett attempted to exchange firearms with Garland, a known illegal straw purchaser of firearms; (2) cell phone records showing Cooper attempted to call Garland himself after Garland refused to provide a clean firearm; (3) cell phone records indicating that Cooper, Bennett, and the victim were in constant contact with each other in the five hours before the murder, whereas there were no further communications between them after the time of the murder; (4) cellular geolocation data demonstrating that Cooper and Bennett's cell phones were together in the hours preceding the murder and that Cooper's cell phone was in the immediate vicinity of the murder scene at 4:16 a.m., at which time it was powered off; (5) cellular geolocation data showing that Bennett and the victim's cell phones were both at the crime scene at 4:56 a.m. and gunshots were reported at 4:58 a.m.; (5) expert testimony establishing that Cooper's right-index fingerprint was found on Bennett's cell phone, which was recovered across the street from the victim's

body, surrounded by fired cartridge casings; (6) ballistics expert testimony that there were two different kinds of fired cartridge casings recovered at the scene, suggesting two shooters; (7) Officer Youssef's testimony that Cooper and Bennett attempted to cross the crime scene tape shortly after the murder, asked questions about the deceased, and wanted to access the crime scene; and (8) Lacey's testimony that Cooper and Bennett asked her to gain entry to the crime scene to retrieve a cell phone they dropped. Based on this abundance of evidence, the jury could reasonably infer that Cooper participated in the planning of the murder, was present at the crime scene before, during, and after the murder, and that he acted with the requisite intent to kill the victim. Therefore, we conclude that the evidence was sufficient for the jury to find Cooper guilty of first-degree murder and conspiracy to commit first-degree murder. Accordingly, no relief is due on Cooper's challenge to the sufficiency of the evidence supporting his first-degree murder and conspiracy convictions.

For the foregoing reasons, we conclude that Cooper's sole issue is without merit, and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/2/2026